HONORABLE PHYLLIS J. HAMILTON

IN THE UNITED STATES COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CARL SCHLACHTE and<br>NANCY SCHLACHTE,<br><br>            Plaintiffs,<br><br>      v.<br><br>THE UNITED STATES OF AMERICA<br><br>      Defendants. | *Case No.*  CV 07-06446 PJH<br><br>DECLARATION OF BRIAN G.<br>ISAACSON IN SUPPORT OF<br>PLAINTIFFS' OPPOSITION TO<br>DEFENDANT'S MOTION TO DISMISS |

1.  I am an attorney representing Plaintiffs Carl Schlachte and Nancy Schlachte in this action.  I have personal knowledge of the matters stated herein and am competent to testify as to the same.

2.  Attached hereto as Exhibit 1 is a true and correct copy of a Freedom of Information Request Letter dated April 30, 2007 to the Department of the Treasury Internal Revenue Service regarding Taxpayers Carl and Nancy Schlachte from Steven M. Graham.

DECLARATION OF BRIAN G. ISAACSON- 1

ISAACSON & WILSON, P.S.
701 Fifth Avenue, Suite 5810
Seattle, Washington 98104
Telephone: (206) 448-1011
Fax: (206) 448-1022

3.  Attached hereto as Exhibit 2 is a true and correct copy of Appeals Case Memo Schlachte, Carl P. and Nancy C., 2000 and 2003, ISSUE 1 Summary and Recommendation produced pursuant to a FOIA request (Exhibit 1).

4.  Attached hereto as Exhibit 3 is a true and correct copy of Form 9984, Examining Officer's Activity Record dated 5/26 – 7/27.

5.  Attached hereto as Exhibit 4 is a true and correct copy of a letter dated July 26, 2006 to Elain Li, Internal Revenue Service from Steven M. Graham regarding Tax Year 2000 Derivium Transactions.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 6th day of May, 2008.

*/S/ BRIAN G. ISAACSON*

DECLARATION OF BRIAN G. ISAACSON- 2

ISAACSON & WILSON, P.S.
701 Fifth Avenue, Suite 5810
Seattle, Washington 98104
Telephone: (206) 448-1011
Fax: (206) 448-1022

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on May 6, 2008 to the CM-ECF system of the United States District Court for the Northern District of California for electronic delivery to all counsel of record.

Thomas M. Newman    thomas.newman2@usdoj.gov

Mark J. Wilson    mjwilson@isaacsonwilson.com, sjbridges@isaacsonwilson.com, yelena@isaacsonwilson.com

*/s/ Brian Isaacson*

DECLARATION OF BRIAN G. ISAACSON- 3 .

ISAACSON & WILSON, P.S.
701 Fifth Avenue, Suite 5810
Seattle, Washington 98104
Telephone: (206) 448-1011
Fax: (206) 448-1022

# EXHIBIT 1



MERRIAM & ISAACSON, P.S.
701 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104
TELEPHONE: (206) 829-2500
FACSIMILE: (206) 829-2501

TERRI A. MERRIAM, J.D., PARTNER
E-MAIL: tamerriam@merriamisaacson.com
BRIAN G. ISAACSON, J.D., LL.M., PARTNER
E-MAIL: bgisaacson@merriamisaacson.com
STEVEN M. GRAHAM, J.D.
E-MAIL: smgraham@merriamisaacson.com

MERRIAM
&
ISAACSON

April 30, 2007

*VIA CERTIFIED MAIL 7003 2260 0006 4339 1367*

Department of the Treasury
Internal Revenue Service
FOIA Request
Fresno Campus Disclosure Office
SE:S:MS:C&L:GLD:A5:FC
5045 East Butler Avenue
Fresno, CA 93727

Re:    Taxpayers: Carl P. & Nancy C. Schlachte
       Taxpayer I.D. No.:              &
       Tax Years: 2000 & 2003

To Disclosure Officer:

This is a request under the Freedom of Information Act and Privacy Act of 1974.

I request that a copy of the following documents be provided to me:

- All information that was made available to the appeals officer conducting the Collection Due Process Hearing. This should include but is not limited to:
  - "[A]n Appeals Case Memo for Derivium Capital, LLC, that was prepared in conjunction with the closing of some earlier cases from this project."
  - "[A]n "advisory opinion" prepared by IRS Counsel which was used as the primary basis for setting up this issue."
  - The Revenue Agent's Report if one was prepared.

- All other final opinions involving Derivium transactions authored or issued by Ronald Cunningham together with the relevant Appeals case Memoranda (if any).

- Full and complete TXMOD transcripts for the taxpayers' 2000 and 2003 tax years.

- All documents that have been provided to the IRS by the taxpayers or their representatives involving the 2000 and 2003 tax years and the Derivium transactions.

*A Professional Service Corporation*

April 30, 2007
Page 2

- All correspondence from the IRS to the taxpayers or their representatives concerning the 2000 and 2003 tax years and the Derivium transactions or the collection of balances due.

- All documents relating to Amended Tax Returns filed by the taxpayers, including any valuations of taxpayers' assets.

- The administrative file for this case, including any review notes, supervisors' comments, and the activity sheets for these taxpayers.

If you determine that any portion of a requested record is exempt, please provide the non-exempt portion. With respect to those records (or portions thereof) to which you believe an exemption from disclosure applies, please provide a list which identifies each record, the number of pages withheld, and the specific exemption which you feel justifies non-disclosure of the information.

I do not wish to inspect the documents first, as there is a compelling need for a speedy response to this request. The Taxpayers are facing collection and are preparing for a Collection Due Process hearing. They need these records reviewed to be able to respond in a timely manner. If they do not receive the records in a timely manner they may lose their rights to effective due process in agreeing to or disputing collection for these years.

In order to determine my status for the applicability of fees, you should know that I am an "Other" Requester. As proof of identity I am including a photocopy of my drivers' license herewith. We agree to pay reasonable charges in locating and copying the requested documents, not to exceed $1,250. If your fees will exceed that amount, please contact the undersigned counsel for further authorization.

Thank you for your consideration of this request. Please direct any notification or correspondence regarding this request to me at the address shown on this letterhead.

Yours truly,

Steven M. Graham
WSBA 27338 WSCPA 10863

Encl:    Power of Attorney
         photocopy of drivers license

| Form **2848** | Power of Attorney | | OMB No. 1545-0150 |
|---|---|---|---|

**Form 2848**
(Rev. March 2004)
Department of the Treasury
Internal Revenue Service

**Power of Attorney
and Declaration of Representative**

► Type or print.   ► See the separate instructions.

OMB No. 1545-0150
For IRS Use Only
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I**  **Power of Attorney**
Caution: *Form 2848 will not be honored for any purpose other than representation before the IRS.*

**1    Taxpayer information.** Taxpayer(s) must sign and date this form on page 2, line 9.

| Taxpayer name(s) and address | Social security number(s) | Employer identification number |
|---|---|---|
| CARL SCHLACHTE<br>NANCY SCHLACHTE<br>906 Gray Fox Circle<br>Pleasanton, CA 94566 | | |
| | Daytime telephone number<br>( 206 ) 829.2500 | Plan number (if applicable) |

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2    Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| TERRI A. MERRIAM<br>701 Fifth Avenue, Ste. 5800<br>Seattle, WA 98104 | CAF No. _____ 8006-14080R _____<br>Telephone No. _____ 206.829.2500 _____<br>Fax No. _____ 206.829.2501 _____<br>Check if new: Address ☑ Telephone No. ☑ Fax No. ☑ |
| Name and address | |
| BRIAN G. ISAACSON<br>701 Fifth Avenue, Ste. 5800<br>Seattle, WA 98104 | CAF No. _____ 8006-08655R _____<br>Telephone No. _____ 206.829.2500 _____<br>Fax No. _____ 206.829.2501 _____<br>Check if new: Address ☑ Telephone No. ☑ Fax No. ☑ |
| Name and address | |
| JARET R. COLES<br>701 Fifth Avenue, Ste. 5800<br>Seattle, WA 98104 | CAF No. _____ 0300-99769R _____<br>Telephone No. _____ 206.829.2500 _____<br>Fax No. _____ 206.829.2501 _____<br>Check if new: Address ☑ Telephone No. ☑ Fax No. ☑ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3    Tax matters**

| Type of Tax (Income, Employment, Excise, etc.)<br>or Civil Penalty (see the instructions for line 3) | Tax Form Number<br>(1040, 941, 720, etc.) | Year(s) or Period(s)<br>(see the instructions for line 3) |
|---|---|---|
| Income | 1040, 1040X, 540, 540X | 1999 - 2006 |
| | | |
| | | |

**4    Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific uses not recorded on CAF . . . . . . . . . ► ☐

**5    Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative, or the power to sign certain returns, or the power to execute a request for disclosure of tax returns or return information to a third party. See the line 5 instructions for more information.

Exceptions. An unenrolled return preparer cannot sign any document for a taxpayer and may only represent taxpayers in limited situations. See the Unenrolled Return Preparer on page 2 of the instructions. An enrolled actuary may only represent taxpayers to the extent provided in section 10.3(d) of Circular 230. See the line 5 instructions for restrictions on tax matters partners.

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: __Executing Section__
__6103(c) for the disclosure of returns and return information. The power to sign amended returns and claims__
__for refund or abatement.__ _____

_____

**6    Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, BUT NOT TO ENDORSE OR CASH, refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ►

| For Privacy Act and Paperwork Reduction Notice, see page 4 of the instructions. | Cat. No. 11980J | Form **2848** (Rev. 3-2004) |
|---|---|---|

Form 2848 (Rev. 3-2004)    Page **2**

| 7 | Notices and communications. Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2. |
| --- | --- |
| a | If you also want the second representative listed to receive a copy of notices and communications, check this box ▶ ☐ |
| b | If you do not want any notices or communications sent to your representative(s), check this box . . . ▶ ☐ |

8  Retention/revocation of prior power(s) of attorney. The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you do not want to revoke a prior power of attorney, check here. . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

9  Signature of taxpayer(s). If a tax matter concerns a joint return, both husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

▶ IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.

| _____Signature_____ | _3/28/2007_ Date | _____Title (if applicable)_____ |
| --- | --- | --- |
| CARL SCHLACHTE  ☐☐☐☐☐ | | |
| Print Name    PIN Number | | Print name of taxpayer from line 1 if other than individual |
| _____Signature_____ | _3/28/2007_ Date | _____Title (if applicable)_____ |
| NANCY SCHLACHTE  ☐☐☐☐☐ | | |
| Print Name    PIN Number | | |

**Part II**    Declaration of Representative

Caution: Students with a special order to represent taxpayers in Qualified Low Income Taxpayer Clinics or the Student Tax Clinic Program, see the instructions for Part II.

Under penalties of perjury, I declare that:

• I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
• I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
• I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
• I am one of the following:

a  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
b  Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
c  Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.
d  Officer—a bona fide officer of the taxpayer's organization.
e  Full-Time Employee—a full-time employee of the taxpayer.
f  Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).
g  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d) of Treasury Department Circular No. 230).
h  Unenrolled Return Preparer—the authority to practice before the Internal Revenue Service is limited by Treasury Department Circular No. 230, section 10.7(c)(1)(viii). You must have prepared the return in question and the return must be under examination by the IRS. See Unenrolled Return Preparer on page 2 of the instructions.

▶ IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED. See the Part II instructions.

| Designation—Insert above letter (a–h) | Jurisdiction (state) or identification | Signature | Date |
| --- | --- | --- | --- |
| a | WA-17242 | | 4-11-07 |
| a | WA-25921 | 73 - 73 A | 4/9/07 |
| a | WA-33247 | | 4/11/07 |

Form **2848** (Rev. 3-2004)

2. Representative(s) Representative(s) must sign and date this form on page 2, Part II.

| Name and address | | CAF No.   8006-21766R |
| --- | --- | --- |
| STEVEN M. GRAHAM<br>701 Fifth Avenue, Ste. 5800<br>Seattle, WA 98104 | Check if new: | Telephone No. 206.829.2500<br>Fax No. 206.829.2501<br>Address ☒    Telephone No. ☒    Fax No. ☒ |
| Name and address<br>MARLYN CHU<br>701 Fifth Avenue, Ste. 5800<br>Seattle, WA 98104 | Check if new: | CAF No.  0303-37973R<br>Telephone No. 206.829.2500<br>Fax No. 206.829.2501<br>Address ☒    Telephone No. ☒    Fax No. ☒ |
| Name and address | Check if new: | CAF No.<br>Telephone No.<br>Fax No.<br>Address ☐    Telephone No. ☐    Fax No. ☐ |

IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED.  See the Part II instructions.

| Designation—Insert above letter (a–h) | Jurisdiction (state) or identification | Signature | Date |
| --- | --- | --- | --- |
| a | WA-27338 | _Steven M._ | 4 – 9 07 |
| a | WA-34494 | _Marlyn Chu_ | 04.11.07 |

EXHIBIT 2

6

# APPEALS CASE MEMO

## SCHLACHTE, CARL P. and NANCY C.

## 2000 and 2003

### ISSUE 1

### SUMMARY AND RECOMMENDATION

Should the taxpayers have reported the transactions they entered into with Derivium Capital, LLC in 2000 as taxable "sales" in 2000, or were they "loans" with no tax consequences until 2003 when they walked away from the "loans"?

I recommend treating the transactions as "sales" in 2000, which is how the taxpayers reported them on an amended 2000 return. The facts and circumstances support a finding that the taxpayers basically sold their stock in 2000 when Derivium gave them 90% of the FMV. Although the paperwork accompanying the transactions characterized the deals as "loans", the contract terms called for the taxpayers to divest themselves of their ownership interest in the stock.

Derivium was operating something of a "Ponzi" scheme, as it didn't actually hold the stock given to it by "borrowers" like the taxpayers as collateral for the loans it allegedly made to the "borrowers". It would sell the stock off shortly after receipt, using the funds to pay off other "borrowers" in return for other stock.

Enclosed in the administrative file are two documents discussing the reasons for treating this transaction as a "sale" instead of a "loan". One is an Appeals Case Memo for Dervium Capital, LLC, that was prepared in conjunction with the closing of some earlier cases from this project. The other is an "advisory opinion" prepared by IRS Counsel which was used as the primary basis by Compliance for setting up this issue.

The Appeals settlement calls for using the funds received by the petitioners (90% of the FMV) as the "sales" price, and computing out the gain as reportable in 2000. This is what was reported on the taxpayers' amended 2000 return, so no adjustment to that return is necessary.

1

The taxpayers have now filed two "new" amended returns:

**2000:** They have now filed a second amended return, removing the Derivium transaction from their return. Since they have not paid the entire tax due on the <u>first</u> amended return ($842,782) this is not subject to claim procedures. Payments made to date have been:

| | |
|---|---|
| Paid with first amended return: | $100,000 |
| Overpayment from a State Income Tax Levy | $   1,051 |
| Overpayment from 2004 Federal Taxes | $ 43,958 |
| Overpayment from 2005 Federal Taxes | $   3,033 |

**2003:** They have now amended their 2003 return to report the Derivium transaction. This resulted in an additional tax liability of $246,662. The taxpayers paid $146,662, and asked that the $100,000 they paid for 2000 with the <u>first</u> amended return be applied to this period. Compliance declined to process this assessment, as the Derivium transaction was deemed to be properly reported in 2000.

My recommendation is to issue a letter rejecting any claim for an abatement of the **2000** taxes. Under the Supreme Court rule of **<u>Flora</u>** 362 US 145 (1960), the U.S. District Court and the U.S. Claims Court have no jurisdiction of a refund claim until the <u>tax is paid in full</u>. Accordingly, no formal claim disallowance letter is to be issued.

I also recommend that the government go ahead and assess the $246,662 additional liability reported on the **2003** Form 1040X. This is a 'whipsaw' adjustment, but it is needed because the taxpayers decline to agree to withdraw their amended returns.

## <u>BRIEF BACKGROUND</u>

In 2000 the taxpayers entered into two purported "loan" transactions with Derivium Capital, LLC. All of the transactions involved the transfer of ARM Holdings stock (stock ID: ARMHY) that the taxpayers had owned for less than one year.

2

The details of these transactions were as follows:

| Date of transaction | 8/24/00 | 3/24/00 |
|---|---|---|
| Number of Shares | 66,266 | 8,860 |
| FMV of the stock | $2,250,436 | $ 301,047 |
| Cash received (90% FMV) | $2,025,392 | $ 270,943 |

The basis in the stock involved in these two "loans" was $189,468.

For both transactions, the contract provided for a "loan" term of three years. At the end of that time the taxpayers had three basic options:

- "Walk away" from the transaction-they need not make any payments to Derivium for the alleged loan terms (principle and interest).

- Renew the loan for another period of time, paying a fee.

- Pay off the "loans" (principle and interest) and have Derivium return to them the same number of shares of NT stock. The computed loan balances at maturity were $2,732,725 and $365,565.

The taxpayers did not report any gain on the "sales" of the shares of ARMHY stock on their original 2000 income tax return, although they received $2,296,335 of cash in 2000 from these transactions.

The taxpayers made no payments on the "loans" in that year or any subsequent year. The stock decreased in value over the term of the "loan", and the taxpayers chose the "walk-away" option.

In response to contacts from the California State Franchise Tax Board and the IRS, the taxpayers amended their 2000 return and included a $2,106,867 short-Term capital gain. ($2,296,335 of cash received minus basis of $189,468). Additional tax of $842,782 was assessed as a result of this amendment.

The taxpayers have now amended this amendment, asking the IRS to remove the reported gain from the Derivium transaction from the 2000 return. They also filed an amended return for 2003, requesting that they be allowed to include any gain from this transaction as a "sale" in 2003 when they walked away from the loan.

## APPEALS ANALYSIS

As mentioned above, included in the administrative file are a previous Appeals ACM and a memo from Counsel that discuss the "loan" v. "sale" issue in this case. In brief, the key to this case is that the taxpayers completely relinquished the incidents of ownership in their stock at the time that they transferred the stock to Derivium. Derivium was then free to do whatever it wanted with the stock. The facts more strongly support a "sale" than a "loan". Some observers have noted that this is more akin to a "sale" with the 10% going to purchase an option that could be exercised if the stock went up in value.

Subsequent to the time that the Appeals ACM and Counsel memos were written, the IRS issued TAM 200604033. While the transaction discussed in that TAM is much more complex "forward sale" than the Derivium transactions, it provides additional support for the Derivium transaction should be treated as a "sale" at the time the "borrower" receives cash.

Of most importance to the case at hand is the TAM's noting that a "sale" is indicated when a taxpayer "did not retain sufficient indicia of ownership". In particular, the relinquishing of "possession" and "control" indicates that there was a "sale". Other points raised in the TAM that are relevant to the Derivium transactions are the facts that the borrowers" in the Derivium transaction didn't retain voting rights and they transferred the risk of loss to the other party.

## CONCLUSION

The taxpayers have now created an awkward situation, with a "new" amended return for 2000 requesting an abatement, and a 2003 amended return showing additional tax. They haven't paid the sizeable deficiency for 2000, and until they do so they cannot proceed with a refund claim in court. With a 'short' statute on the 2003 amended return, and no resolution of the issue, I recommend that the government assess the 2003 tax as per the amended return. Hopefully, the taxpayers will withdraw their amended returns and proceed with payment of the 2000 debt.

RONALD CUNNINGHAM
APPEALS OFFICER

4

# EXHIBIT 3

## Examining Officer's Activity Record

### Contacts and Activities

| Date | LOC | CONT | Time on Activity | Remarks, Notes, Actions Taken |
|------|-----|------|------------------|-------------------------------|
| 5/26 | 4 | O | 4 | research LMSB website for settlement 2005-80 |
| 5/30 | 4 | O | 4 | Studied info whin website, Started to Prepare F906. |
| 5/31 | 2 | R | O | Returned call to Rep Not available. LMCB. |
| 5/31 | 2 | O | 2 | Call Bill wilson again for the time frame when Grand Thorton was put under Criminal Investigation Bill stated he'll call me back in an hour. Bill called back & stated that this is a qualified 10110x w/10% Penalty. LMSB has different Procedure on F906 than SBSE. But still send F906 to him for Review. |
| 6/5/06 | 2 | R | O | Called Rep again. Not available. LMCB. Rep. Mr. Banishi stated that he's no longer representing TP. TP has new POA. Mr. Banish stated he'll call TP & have TP call back w/ new info. |
| 6/6/06 | 2 | R | O | Dorothy from Isaacson law firm called & asked for fax # so she can fax the new POA to Agent. |
| 6/6/06 | 2 | R | O | return call to Dorothy & provided fax # |
| 6/8/06 | 3 | R | 2 | Received POA via fax. fax POA to DSC for Processing. Return call to Rep Brian Issacson Discussed case status, Rep disagreed w/IRS Position. He Stated that TP believed the transaction was for a loan. TP did not know Derivium would sell the stocks and run off with the money. Rep also Stated that TP expected to receive the stock back as soon as he paid off the loan. When questioned Rep how the loan was supposed to be paid off. Rep Stated that it's should be paid off according to the contract. Rep's question & Position was that IRS don't know |

103
127

## Examining Officer's Activity Record

### Contacts and Activities

| Date | LOC | CONT | Time on Activity | Remarks, Notes, Actions Taken |
|------|-----|------|------------------|-------------------------------|
| | | | | the actual sales of Stock occurred. He also Stated that there should be a that loss due to DC Sold TP's Stocks w/o his Knowledge. |
| 6/9 | 4 | 0 | 4 | Review Case |
| 6/12 | 2 | 0 | 0 | Spoke w/ Judith Steiner (CRB in Sacramento) Phone # 916-974-5429. Discussed Background of Derivium & the nature of the 90% Stock Loan transaction. She'll e-mail Agent the templates on this issue. |
| 6/20 | 3 | 0 | 0 | Received info from Judy via fax. |
| 6/21 | 2 | 0 | 4 | Reviews info received, Called Judy & Discussed info Received. Revised F886A & faxed to DOJ Mr. Isaacson. |
| 6/26 | 4 | 0 | | e-mail Received from Bill Wilson. He Stated that after talking to Judy. neither of them think this is a Notice 99-59 issue. Agent faxed a Copy of the Preliminary Determination from the LDC to Bill as requested. |
| 6/26 | 2 | 0 | 4 | conference call w/ Rep. Rep disagreed w/ Claim disallowance. Rep requested to go to appeal. Agent advised Rep to send in written request. Proposed fully disallowance Package sent to TP. TPW & Rep. Written request for appeal is due July 26 06. |
| 6/27/06 | 4 | 0 | 6 | Called Judy Steiner & Bill Wilson to ensure that case can be forwarded to appeal. Spoke to Joe Calderaro regarding the appeal right. He Stated that TP only have appeal right if they paid the liability in full, not in part. However, Since this is a coordinated appeal case. Agent should contact the coordinator |

## Examining Officer's Activity Record

| Date | LOC | CONT | Time on Activity | Contacts and Activities — Remarks, Notes, Actions Taken |
|------|-----|------|------------------|---------------------------------------------------------|
|      |     |      |                  | appeal office to see if they would accept the case. e-mail to Judy Stein for Instruction. researched fully disallowance claim in IRM & IDA. |
| 7/6  | O   | D    | O                | e-mail received from Judy Steiner stating that appeal will accept this case. However, Judy advised Agent to advise Rep of appeal's position in supporting the gov's position. Sent out the claim disallowance ltr to both TP & TPW and Rep. Called Rep. (MCB |
| 7/18 | R   | 3    | O                | appeal request received from Rep |
| 7/21 | O   | 4    | 8                | Prepared case to go to appeal. called Judy Steiner for advice on 2003 1040X. |
| 7/24 | O   | 3    | O                | received e-mail from Judy Steiner with instruction on closing 2003 1040x. research GST withdraw procedure. |
| 7/26 | O   | 4    | 4                | GST withdraw received from Rep. e-mail to LDC per procedure. Prepare 2003 1040 for closure. |
| 7/27 | O   | 4    | 4                | Faxed GST withdraw letter to Tracy Pettinary as requested. Complete 2003. Close case to gov. |
| 7/27 |     |      |                  | Forwarded to Status 21 |

EXHIBIT 4

# THE ISAACSON LAW FIRM, P.L.L.C.

July 26, 2006

Brian G. Isaacson
LL.M. in Taxation
Admitted in Washington
briani@isaacsonlawfirm.com

Steven M. Graham
Admitted in Washington
steve@isaacsonlawfirm.com

Ms. Elain Li
Internal Revenue Service
1301 Clay Street, Suite 900S
Oakland, CA  94612

RE:  Carl Schlachte, Tax Year 2000 and Derivium Transactions

Dear Ms. Li,

The purpose of this correspondence is to withdraw the election to participate in the announcement 2005-80 settlement issue since no penalties have been assessed during the audit by the IRS. We also are requesting an Appeals Conference, and that you forward the case to Appeals as soon as possible. We were deeply distressed with your position and hope you will reconsider. You expressed to Mr. Isaacson that it was unlikely that any facts or legal authorities that Mr. Isaacson could present would cause your group to change their opinion that the determination that Mr. Schlachte's Derivium transaction was a sale as of the date of the loan agreement. On June 9, 2006 Ms Li presented us with an 886-A that she proposed sending (hereinafter the Old Report, Exhibit A). We responded with additional arguments and information. Her only response to the information we offered is the attached 4549-A and 886-A (Exhibit B).

Ms. Li told us we could anticipate that your group's decision will be to issue a "boiler plate rejection." We are sorry that we have received one. You have failed to consider the facts and law relevant to Mr. Schlachte's transactions. Please consider the attached documents which shed new light on many of the assertions formerly made by the IRS Derivium Group.

New evidence is showing up in Federal Courts involving Derivium, and it is appropriate for you to reconsider the factual disputes and legal arguments the Derivium Group has accepted. We feel it is too early for you to have already formed an opinion as to all relevant factual and/or legal issues and state that it is unlikely that you will be deviating from the pre-established opinion or acknowledge any facts or legal authorities that contradict these opinions.

## Facts

- Derivium advertised the product as a loan.
- Derivium promised hedging and "Return of Client Collateral" if the loan was paid.
- Charles Cathcart promised that he had developed a "highly proprietary and highly sophisticated hedging program" that allowed Derivium to "protect[ ] itself by going out and placing its own hedges on the security."
- Derivium created an implied trust under California Law by its advertising. This obligated Derivium to keep the clients' shares and provide hedging sufficient to reasonably guarantee that the clients' securities could be returned at the end of the loan.
- There is no evidence of a hedging program and there is no evidence that the lender took any steps to be prepared to repay the loans, or did in fact repay the loans other than from the

proceeds provided by new investors. (This method of making income is typically known as a Ponzi scheme.)

- Immediately after receiving stock from a borrower, Derivium sold the stock returned 90% to the borrower, kept a commission, and forwarded the rest to Offshore Companies.
- Neither the borrowers or their financial advisors knew Derivium would sell the borrowers shares.
- These Offshore Companies then sent the funds to a bank in Lichtenstein, where Bank Secrecy Laws prohibit the lender from giving information on clients unless ordered to provide the information by the Lichtenstein Government. See Exhibit C, The Observer, "Trouble in Banking Paradise as Uncle Sam's Sheriffs Ride In" (October 27, 2002), available at http://observer.guardian.co.uk/business/stategy/0,6903,819815,00.html.
- The private bank receiving the funds had been the end point for two earlier frauds, one involving a Doctor who faked medical studies. See Exhibit D, The National, "The Secret Life of Dr. Chandra, Part Two" (January 31, 2006), available at http: www.cbc.ca/national/news/chandra/part2.html A similar fraud by this bank involved time shares in England

These facts cited above are drawn from Court filings related to Derivium and from published reports.

## Court Cases

Please consider the documents filed in the following Court cases, which are available on Pacer:

Newton Family LLC v. Charles Cathcart et. al., No. 05-cv-132J (D. Wyo. filed May 3, 2005).

Hammond Family 1994 v. Diversified Design, No. 2:04-cv-22855 (D.S.C. filed November 3, 2004).

General Holding Inc. v. Charles Cathcart and Derivium Capital USA, Inc., No. 2:06-cv-01121-DCN (D.S.C. filed April 11, 2006).

In Re: Derivium Capital, LLC, No. 05-15042, (Bankr. D.S.C. filed February 13, 2006).

Sabellhaus v. Derivium Capital, No. 2:05-cv-01806, (D.S.C. filed June 6, 2005).

In Re: Derivium Capital, LLC, No. 05-37491, (Bankr. S.D.N.Y. filed September 1, 2005).

WCN/GAN Partners, Ltd. V. Cathcart et. al., No. 1:05-CV-01452, (D. Colo. filed November 2, 2005).

## Websites

Please consider the following web sites:

http://alabamaagainstfraud.com

9

http://www.deriviumclients.org

## Legal Arguments and Authorities

### Derivium's Theft and/or Fraud

Your group presently asserts an argument of substance over form, asserting that the real nature of the transaction was a sale; that this was apparent at the time of the transaction and therefore the appropriate tax treatment should be that of a sale. We ask you to consider whether the real nature of the transaction was a theft. If the transaction was a theft, it should be treated as described (as a loan) until discovery of the fraud, or as not having been a transaction at all. Legal title is not transferred by theft, and the right to reclaim property remains in the legal owner even after a theft.

> "A victim of theft is entitled to recover the stolen assets or anything acquired with the stolen assets, even if those assets have a value that exceeds the value of that which was stolen. *See* Pena v. Toney, 98 Cal.App.3d 534, 542,160 Cal.Rptr. 4 (1979); Rest.3d Restitution (Trent Draft No. 4, Apr. 8, 2005)"
> CTC Real Estate Services v. Lepe, 44 Cal.Rptr.3d 823, 824, 140 Cal.App.4th 856, (Cal. Ct. App. 2nd Div. 2006)

At the date of discovery, or when there is no reasonable prospect of recovery, any unrealized loss should be allowed as a theft loss.

Ms. Li tries to make a case that the transaction should be construed as a sale based on the undisclosed and unexpected actions of the thief rather than the form of the documents (loan) or the reasonable expectations of the borrower (loan). This argument has no merit. Thus, the issue that "Derivium immediately sells the stock, funding the loan on behalf of an offshore lender after the sale is completed" is completely irrelevant. It does not matter what Derivium did, what matters is what a reasonable man would anticipate Derivium would do. Derivium acted as an agent for a large-scale fraud where the borrowers gave up their stock for less than stock's value based on false promises. What the thief did with property obtained by theft should have no tax ramifications on the victim.

Derivium, for itself, or for an undisclosed principal, made false promises, and committed fraud by making material omissions to Mr. Schlachte with the intent to induce him to transfer stocks to Derivium for less than their value. Specifically Derivium obtained by fraud 100% of the value of shares and interest on 90% of the value of the shares in return for providing 90% of the value of the shares as a loan and promising benefits (such as hedging and the opportunity to redeem the shares at the end of loan) which Derivium knew were not being provided. See Exhibit E, Verified Second Amended Complaint, Newton Family LLC v Cathcart et. al. No. 05-cv-132J (D. Wyo. filed May 3, 2005). This is Theft by California Law as either theft by deception or embezzlement. California Penal Code § 484(a).

Furthermore, Derivium promised Mr. Schlachte that his stock would be retained and a hedge established against the value of these shares. Derivium's actual practice was to sell the stock upon receipt thus violating these promises. See Exhibit A, Form 886-A. To conceal the violation of these promises, Derivium provided a fabricated statement to Mr. Schlachte showing "his" stock in their account, adjusting the stated stock for splits and allowing for the credit of dividends. Derivium's

failure to use the property entrusted to them is theft by deception or embezzlement under California Law. *See* People v. Steele, 235 Cal.App.2d 798 (2nd Dist. Div. 4 1965).

California Civil Code Section 1689 provides several alternative reasons legal grounds for Mr. Schlachte to rescind the contract and recover his stock including all uses, rights and benefits. These grounds are: 1) his consent was obtained by fraud; 2) the Derivium program was an endless chain scheme; 3) the exchange failed in whole or part due to the fault of the seller when the hedging was not established; 4) this also was a failure in a material part of the contract. Thus, Mr. Schlachte had at all times the right to the return of his stock, to vote the stock, to receive all dividends, and to each and every right that is given to the legal owner of the stock.

### The Contract was Enforceable as a Loan in California Superior Courts and was not Enforceable as a Sale of Securities under California Law

In *California v. Derivium*, the Sacramento County Superior Court ruled in Case No. 02AS05849 that the Derivium transaction was a loan and not a sale of securities. The California Corporations Commissioner argued that the Derivium transaction was in substance a sale of stock and not a "bona fide secured transaction in outstanding shares" because the Master Agreement had language stating:

> "The Client understands that by transferring securities as collateral to DC and under the terms of the Agreement, the client gives DC and/or its assigns the right, without requirement of notice to or consent of the Client, to assign transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan."

The Court rejected this argument stating:

> [Derivium] produced evidence that [Derivium's Clients] transferred securities to Derivium for consideration, i.e. a transaction in securities. However, [Derivium] argue[s] that there is no evidence to demonstrate that the subject transaction was anything other than a "bona fide secured transaction in outstanding shares." The Commissioner counters with no evidence contradicting the secured nature of the subject transaction other than the undisputed terms of the transaction [quoted above] which permit Derivium or BVL to liquidate the securities immediately upon taking possession under the pledge. The Commissioner has presented no authorities to support the proposition that a pledge of stock as a security, or its agent can not liquidate the pledged securities absent a default, or that the liquidation affects the bona fide nature of the secured transaction. While the immediate liquidation of the security may have many untoward impacts upon the parties to the transaction, those potential impacts have no apparent relevance to the bona fide nature of the primary transaction.

The argument that the Derivium transaction was a sale has also been raised in multiple arbitrations. It has yet to be successful. Arbitrations awards rejecting the sale argument have been accepted by several Federal Courts. The argument that Derivium transactions are sales and not loans is rapidly approaching the stage where asserting it will be deemed frivolous. Even if a court did

decide that a Derivium transaction was a sale, it would not apply to Mr. Schlachte, as his State Court has spoken, and in California the transaction will be treated as a loan. Ms. Li has been asked to provide any facts that she feels differentiate Mr. Schachte's case from the general Derivium case, and she has not brought any facts forward.

Treating the Derivium transaction as a sale is contrary to IRS Revenue Rulings and previous decisions. *See* Exhibit F, Declaration of Edward O.C. ORD in Opposition to the Trustee's Motion to Convert the Chapter 11 Proceeding to Chapter 7, In Re: Derivium Capital LLC, Debtor, No. 05-37491 (Bankr. S.D.N.Y. filed September 1, 2005). And *see* Exhibit G, Borrowers' Proposed Brief in Support of Debtor's Appeal, In Re Derivium Capital LLC, Debtor, No. 05-37491 (Bankr. S.D.N.Y. filed September 1, 2005). These filings raise issues that should be considered in Mr. Schlachte's case.

## The Explanation of Items is not Supported as to Facts or Law

The 886-A incorrectly states "Taxpayer transfers stock to Derivium, retaining no right to vote the stock, and receives 90% of the fair market value back as a loan payable over three years at an above market interest rate."

Ms. Li has presented no facts which demonstrate that the Taxpayer retained no right to vote the stock. Ms. Li also send an earlier 866-A prepared for Mr. Schlachte's 2000 1040X (the Old Report, Exhibit A) which she stated she intended to rely on. It erroneously stated: "Dc will have the right to any dividends earned on those shares... DC also has the voting rights for said securities." To the contrary, the Master Agreement signed by Mr. Schachte provided:

> DC is hereby appointed Custodian of the Properties and authorized to act on behalf of the Client with respect to the Properties for Purposes of:
>> c. Voting shares and receiving dividends or interest on securities held as collateral.

Derivium's marketing materials indicated that dividends would be applied toward interest owed. Statements from Derivium indicate that dividends were applied to interest. Clients who redeemed their shares received the benefit from these dividends. Clients who did not redeem traded the loan balance for the shares and so also benefited from the dividends.

We have not heard of anyone who sought to instruct Derivium how to exercise their share's voting rights while their shares were pledged; however, under the contract language it would appear that Derivium undertook the burden to vote the shares "on behalf of the client." Therefore, if a client had instructed Derivium how to vote the shares Derivium would have been obligated to do so.

Ms. Li was unable to document her earlier position on dividends and appears to have conceded it stating in the facts section of the 886-A: "Declared Dividends are credited to interest due." Ms. Li is still unable to document her position on the right to vote these shares. Ms. Li's position is contrary to the agreement and unsupported.

We also take issue with Ms. Li's statement that "Taxpayer transfers stock to Derivium ... and receives 90% of the fair market value back payable over three years." First, as a technical point, "Fair Market Value" is a term of art in tax and is strictly defined for publicly traded stock as the average of the daily high and low sale value at the date of exchange. This was not what Mr. Schlachte received. We suspect that he received 90% of a moving average price based on days selected by Derivium. We suspect that Derivium only approved stocks that had risen at the time of approval and manipulated the purchase price by choosing favorable time periods for the moving average. Second, the loan was not "payable over three years", it was payable at the end of three years.

## Treatment by the Parties

The 886-A states: "Both taxpayer and Derivium treat the stock as belonging to Derivium." No facts or evidence are presented to justify this conclusion. Mr. Schlachte believed he had the right to redeem his shares. Mr.Schlachte continued to keep and monitor reports that showed the value of his shares. Derivium continued to provide reports that showed the value of Mr. Schlachte's shares. Mr.Schlachte expected Derivium to provide the 1099s required of every financial institution. Mr.Schlachte would have reported his Derivium transactions in accordance with the 1099s from Derivium.

The 886-A states: "[T]axpayer's right to reacquire the shares is not absolute." This is incorrect. The borrower is granted an absolute right to reacquire the shares by the Master Agreement:

> DC agrees to return at the end of the loan term, the same number of shares of the same securities received as collateral ... Said Collateral shall reflect any and all stock splits, conversions, exchanges, mergers, or other distributions, except dividends credited toward interest due.

There are no conditions set on borrowers rights; at the end of the loan agreement the taxpayer has absolute right to recover the shares by paying the loan off. The 886-A claim that "Derivium's right to sell the shares is not limited in any way..." is irresponsible The Master Agreement clarifies that the stock is held as a bailment and the 886-A also recognizes that " [T]axpayer transfers stock to Derivium to hold as collateral for an offshore lender."

## Acquisition of Equity and Receipt of Profits

Acquisition of equity can be a factor in determining whether a sale is intended by the parties. It is usually examined for a business or real estate investment. If the borrower can elect to convert debt into ownership, or has a bargain purchase option at the end the sale, it is evidence the transaction is a sale. Under this analysis since the contract does not grant any right to convert to equity or a bargain purchase to the borrower the contract is considered a loan.

Similarly the receipt of profits as opposed to fixed interest rates is often considered the sign that a business or piece of real estate is being sold rather than a loan being made. In the Derivium loans the interest rate is 10.5%. It is not 10.5 % plus dividends. Derivium is thus expected to receive 10.5% fixed interest regardless of the company's profits. Since this is a fixed rate rather than participation in profits, it indicates the transaction is being considered a loan not a sale.

## Receipt of Profits.

The 2000 886-A (Exhibit A) stated: "There is to be an interest rate of 10% per annum on the loan amount which is due in three years." Mr. Schachte's nominal interest rate was 10.5%.

The Old Report appeared to consider this interest rate high. The 886-A states again that: "the loan is payable over three years at an above market rate of interest." In fact the rate is only slightly higher than the market rate for margin loans and is artificially low for the small available size of loans and when the nonrecourse nature and minimal collateral requirements are considered. This was pointed out in an article from Traders Daily. See Exhibit H, Trader Daily, "Derivium Debacle Unfolds" (July 2005), available at http://www.traderdaily.com/news/item/896.html. "These

[Derivium Loans] drove me freaking crazy," said one former OTC derivative structurer at a major bank. "It was like someone was able to offer a margin loan with a free built-in put option - - even though the rate of interest they were charging was slightly higher than the market rate. There was no way to make the math work." The math did not work, and Derivium ended up obligated to pay out hundreds of millions of dollars for stock that had appreciated more that the interest costs.

The Old report did not analyze the financial feasibility of repurchasing the shares. Instead it stated: "[Y]ou can request to retain your shares after the 3 years after paying the interest. I believe the cost would be so high that this would not be financially feasible." Ms. Li still has apparently not done any economic analysis of the transaction. Her 886-A still states: "If the stock decreases in value, taxpayer will still have to pay the entire balance and accrued interest, not an economically feasible alternative." With all due respect to Ms. Li, no weight should be given to her personal opinion, it is simply erroneous.

The attached calculation shows, at the highest marginal tax rate, an annual growth rate of 3.5% or higher for the stock would make it economically feasible to retain ownership of the shares. See Exhibit I, Spreadsheet. This rate would be even lower if the borrower: included time value of money calculations for either the interest or tax deferral; expected a lower capital gain rate from retaining ownership of the shares; expected tax rates to decline; or, expected interest rates to rise. Other factors that could add to economic feasibility are the value of reducing the risk of loss through diversification of concentrated positions and ability to obtain cash when selling shares might be legally restricted or viewed unfavorably.

More sophisticated Derivium clients, such as those referred to Derivium by their financial advisor, would use a cost to value of capital analysis. The true economic cost of the loan would be compared to the individuals Return On Investment (ROI) or Cost of Capital. The cost of the loan would be offset by the value of the capital according to its use or investment. For instance, if the funds from the loan were invested in a mixed stock and bond portfolio expected to earn six percent a year, the net interest cost would only be 4.5% and feasibility would be much easier to achieve. If the funds from the loan were invested in a diversified stock portfolio expected to earn eight percent a year, the net interest cost would only be 2.5%. If the loan was used instead of a mortgage at 9.0% the cost becomes 1.5%.

Derivium's bankruptcy filing demonstrates that for borrowers as a group, it was economically feasible to invest in the Derivium loan. Derivium loaned approximately one billion dollars. It should have received approximately one hundred million dollars in commissions. Part of this hundred million had to be used to pay expenses and referral commissions. Yet, the Bankruptcy filing indicates claims exceeding $100,000 million for the return of stock. This demonstrates that Derivium went bankrupt because there were more winners than losers under the 90% loan program even with the slightly higher than normal nominal interest rate.

The 886-A states; "The Stock Transactions utilize an above market interest rate of interest. It does not appear that the interest rate is tied in any way to prevailing market conditions. An analysis of market rates during the years 1998 through 2004, inclusive, shows that none of the rates reached as high as the Derivium rates. We believe that the interest rate is arbitrarily fixed at such a high level top account for any dividends and/or stock splits and to discourage repayment."

We would like to see the analysis. As previously stated, the loan interest is similar to other similar stock margin loans. It may be below the market rate if the relatively small size of loans or repurchase right is correctly considered.

Obligation of the Parties

Derivium is obligated to: (1) hold the stock as collateral for the loan; (2) provide hedging to insure Derivium's ability to return the stock; and, (3) return the client collateral at the end of the loan. Derivium also agrees to: credit dividend to accrued interest; vote the shares on behalf of borrower; hold the securities only as defined in the Registration and Subcustodians clause; and, perform "any and all [] further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

Schlachte is obligated to: 1) not use the loan proceeds to purchase securities; and, 2) either repay the loan or surrender the shares at the end of the loan term.

The Agent's Report's cites *Miami National Bank v. Commissioner*, 67 T.C. 793 (1977). This case does not support the argument that a sale occurred. In *Miami National Bank* (as in Mr. Schlachte's case) the Commissioner misconstrued a subordination agreement which granted a lender power to sell stock as terminating the borrower's rights and ownership. The Court stated:

The Law recognizes that an owner of personal property may transfer possession of it to another person for a specific purpose and create a bailment, and that the bailee may also be given the power to acquire or transfer title to the property under specified conditions. ... Whether such bailment is created depends upon the intent of the parties, and we are satisfied that such a bailment was created by the subordination agreement. In such a bailment, the bailor remains the beneficial owner of the bailed property.

Here the documents specify a bailment. The Master Agreement states:

"This Agreement is made for the purpose of engaging DC to provide or arrange financing(s) and to provide custodial services to the Client, *with respect to certain properties and assets ("Properties") to be pledged as security..."*

Ms. Li also concedes that bailment, stating in the 886-A Facts statement: "Taxpayer enters into a transaction whereby the taxpayer transfers stock to Derivium to hold as collateral for an offshore lender." Mr. Schlachte disputes any knowledge of an offshore lender; however he appreciates Ms. Li's concession that the shares were to be held as collateral. This is concession of the pledge of the securities.

Schedule D also acknowledges a Pledge of Securities. Item three entitled "PLEDGE OF SECURITIES" states:

In exchange for the extension of a loan to the Client collateralized by the Client's securities, the Client authorizes DC to hold or place the Client's securities .... On repayment of a loan in full by the client, DC has the obligation to return to the Client the same number of shares of the same securities as those received by DC, adjusted for any stock splits, reverse splits, mergers, spin-offs, or similar changes affecting the Client's position as beneficial owner of the securities.

Not only do the documents speak of a pledge of securities but the economic substance of the pledge is reinforced by the contract term, no matter what the lender does with the collateral. If the Client chooses to redeem the property at the end of the pledge, by contract, he is placed at the same

position as if he had been the beneficial owner of the property. The economic substance is a pledge, if the borrower walks away from the collateral he finalizes a transfer of property for the amount owed; if the borrower redeems, he gets his property back just as if he had remained the beneficial owner.

Mr. Schlachte asserts that he intended a bailment. Mr. Schlachte maintained the right to reacquire his shares. No facts have been presented to indicate that the transaction was not a bailment. This also explains why *Commissioner v. Brown*, does not apply. In *Commissioner v. Brown*, the IRS wrongly asserted that no sale had occurred. In the *Brown* case, the parties: agreed they had intended a sale; had transferred fair value for the item sold; and one party retained only a creditor's interest in the property. Here Mr. Schlachte did not intend a sale, received only 90% of the value exchanged, and retained the right to fully redeem the property based on a commercially reasonable interest rate. Under the *Brown* analysis no sale occurred.

As a matter of California Law, there were restrictions on the lender's use of the stock received. In California, a trust can be created by either: an express agreement restricting the use of property held for the benefit of another; or, by implied promises as to the use of property. We point to the facts that all of Derivium's advertising asserted that the shares would be kept and a hedge position established. The agreement specified that the dividends received would be against the interest due. These and multiple similar promises all created binding legal obligations requiring Derivium to keep the shares in trust for Mr. Schlachte.

### Right of Possession

The Master Agreement granted Derivium the right to possess the securities as a bailee until the end of the loan term.

### Risk of Loss

The analysis presented is simplistic. The taxpayer has collared his loss, but the exact parameters are not clear. The borrower retains full upside gain and dividends. He limits his loss to the loan value plus interest. In nonrecourse loans or pledges the liability is limited to the collateral, this does not make the transaction a sale.

Yours truly,
The Isaacson Law Firm


Steven M. Graham
WSBA 27338 WSCPA 10863

Encl.: Exhibits A through I

cc:    Carl Schlachte